1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TONY L. BURNS,

11              Plaintiff,                    No. 2:10-cv-01563 MCE KJN PS

12        v.

13   OFCR KEVIN BARRETO;
     OFCR MARK SIMONSON OF
14   THE BENICIA POLICE DEPT,

15              Defendants.                   ORDER and FINDINGS AND
                                              RECOMMENDATIONS
16   _____/

17              Presently before the court is defendants' motion for summary judgment or, in the

18   alternative, partial summary judgment (Dkt. No. 47).[1]  Plaintiff filed a written opposition to

19   defendants' motion (Dkt. No. 58), which predominantly consists of a motion for relief from a

20   final judgment, order, or proceeding filed pursuant to Federal Rule of Civil Procedure 60(b).

21              The court heard this matter on its May 31, 2012 law and motion calendar.

22   Plaintiff, who is proceeding without an attorney, appeared at the hearing and represented himself.

23   Attorney Danielle K. Lewis appeared on behalf of defendants.

24   ////

25   _____

26        [1]  This action proceeds before the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).

1    The undersigned has fully considered the parties' briefs, the parties' oral

2    arguments, and appropriate portions of the record.  For the reasons that follow, the undersigned

3    denies plaintiff's Rule 60(b) motion as prematurely filed and recommends that defendants'

4    motion for summary judgment be granted.  Accordingly, the undersigned recommends that

5    judgment be entered in defendants' favor and this case be closed.

6    I.    OVERVIEW

7    The operative complaint is plaintiff's Second Amended Complaint (Dkt. No. 37),

8    which contains very few factual allegations.  However, attached to that pleading are exhibits that

9    somewhat flesh out plaintiff's allegations that two officers of the Benicia Police Department

10   violated plaintiff's rights under the Fourth Amendment to the United States Constitution to be

11   free from unreasonable searches and seizures.[2]

12   Plaintiff's Second Amended Complaint alleges claims pursuant to 42 U.S.C.

13   § 1983 against Benicia Police Department officers Kevin Barreto and Mark Simonson.  In

14   essence, plaintiff alleges that on June 28, 2008, officer Barr

15   eto unlawfully searched plaintiff during a traffic stop and officer Simonson unlawfully used a

16   Taser on plaintiff, all of which violated plaintiff's constitutional rights.  (See Second Am.

17   Compl. ¶¶ 2(1)-(2).)  Plaintiff appears to allege constitutional violations based on two unlawful

18   searches of his person by Barreto, and one constitutional violation based on the use of excessive

19   force by Simonson.

20   II.   PLAINTIFF'S MOTION FOR RELIEF PURSUANT TO RULE 60(B)

21   Before addressing defendants' motion for summary judgment, the undersigned

22   addresses plaintiff's motion for relief from a final judgment, order, or proceeding, which makes

23

24   [2]  The following documents are attached to the Second Amended Complaint: (1) a Solano
     County Sheriff's Office Arrest Report dated June 28, 2008; (2) an Incident Report dated June 29,
25   2008; (3) a supplemental Incident Report dated June 29, 2008; and (4) a declaration of Deputy Public
     Defender Laurie Berliner, who was the attorney of record for plaintiff in connection with criminal
26   charges of drug possession and resisting arrest.

2

1   up the bulk of plaintiff's written opposition to the motion for summary judgment.  (See Pl.'s

2   Opp'n at 1-6.)  Pursuant to Federal Rule of Civil Procedure 60(b), plaintiff seeks relief from a

3   final judgment, order, or proceeding, on the grounds that defendants committed fraud, made

4   misrepresentations, or committed misconduct in moving for summary judgment.  (See id. at 2.)

5   Specifically, plaintiff "believes that defendants have misrepresented themselves in their

6   statement of genuine material facts by adding in words, events, or actions that (1) did not happen

7   (2) and are not present on any of the previous statements given by defendants."  (Id.)

8           Federal Rule of Civil Procedure 60(b)(3) authorizes a party to file a motion for

9   relief from "a final judgment, order, or proceeding" on the grounds of "fraud . . . ,

10  misrepresentation, or misconduct by an opposing party."  By rule, "[a] motion under Rule 60(b)

11  must be made within a reasonable time, and a motion made pursuant to Rule 60(b)(3) must be

12  made "no more than a year after the entry of the judgment or order or the date of the proceeding."

13  Fed. R. Civ. P. 60(c)(1).

14          Setting aside the merits of plaintiff's allegations of fraud, misrepresentations, and

15  misconduct, the court denies plaintiff's Rule 60(b)(3) motion as prematurely filed.  Relief

16  granted pursuant to Rule 60(b) is relief from a "*final* judgment, order, or proceeding."  Fed. R.

17  Civ. P. 60(b) (emphasis added).  The term "final" modifies not only the term "judgment," but

18  also the terms "order" and "proceeding."  See Fed. R. Civ. P. 60(b) advisory committee's notes

19  to 1946 amend. ("The addition of the qualifying word 'final' emphasizes the character of the

20  judgments, orders or proceedings from which Rule 60(b) affords relief . . . ."); Kapco Mfg. Co. v.

21  C & O Enters., Inc., 773 F.2d 151, 154 (7th Cir. 1985) (stating that "'final' in Rule 60(b) must

22  modify 'order, or proceeding' as well as 'judgment,'" and that Rule 60(b) "is a method of

23  reopening a closed case").  Here, plaintiff does not seek relief from a final judgment, final order,

24  or final proceeding.  Indeed, plaintiff could not have sought such relief in opposing a motion for

25  summary judgment because the court has not entered a final judgment or final order, and no final

26  proceeding had taken place at the time of plaintiff's filing.  Accordingly, plaintiff's prematurely

1  filed Rule 60(b)(3) motion is denied.

2  III.    LEGAL STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

3          Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for

4  summary judgment, identifying each claim or defense--or the part of each claim or defense--on

5  which summary judgment is sought."  It further provides that "[t]he court shall grant summary

6  judgment if the movant shows that there is no genuine dispute as to any material fact and the

7  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[3]  A shifting burden of

8  proof governs motions for summary judgment under Rule 56.  Nursing Home Pension Fund,

9  Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010).

10 Under summary judgment practice, the moving party

11              always bears the initial responsibility of informing the district court
             of the basis for its motion, and identifying those portions of "the
12             pleadings, depositions, answers to interrogatories, and admissions
             on file, together with the affidavits, if any," which it believes
13             demonstrate the absence of a genuine issue of material fact.

14 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).

15 "Where the non-moving party bears the burden of proof at trial, the moving party need only

16 prove that there is an absence of evidence to support the non-moving party's case."  In re Oracle

17 Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ.

18 P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not

19 have the trial burden of production may rely on a showing that a party who does have the trial

20 burden cannot produce admissible evidence to carry its burden as to the fact").

21         If the moving party meets its initial responsibility, the opposing party must

22 establish that a genuine dispute as to any material fact actually exists.  See Matsushita Elec.

23 Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary

24 _____

25         [3]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
   2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56,
26 "[t]he standard for granting summary judgment remains unchanged."

judgment, the opposing party must demonstrate the existence of a factual dispute that is both

material, i.e., it affects the outcome of the claim under the governing law, see <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Fortune Dynamic, Inc. v. Victoria's Secret Stores</u>

<u>Brand Mgmt., Inc.</u>, 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such

that a reasonable jury could return a verdict for the nonmoving party,'" <u>FreecycleSunnyvale v.</u>

<u>Freecycle Network</u>, 626 F.3d 509, 514 (9th Cir. 2010) (quoting <u>Anderson</u>, 477 U.S. at 248).  A

party opposing summary judgment must support the assertion that a genuine dispute of material

fact exists by: "(A) citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . . ,

admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact."[4]  Fed. R. Civ. P. 56(c)(1)(A)-(B).  However,

the opposing party "must show more than the mere existence of a scintilla of evidence."  <u>In re</u>

<u>Oracle Corp. Sec. Litig.</u>, 627 F.3d at 387 (citing <u>Anderson</u>, 477 U.S. at 252).

        In resolving a motion for summary judgment, the evidence of the opposing party

is to be believed.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255.  Moreover, all reasonable inferences that may

be drawn from the facts placed before the court must be viewed in a light most favorable to the

opposing party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587; <u>Walls v. Central Contra Costa Transit Auth.</u>,

653 F.3d 963, 966 (9th Cir. 2011).  However, to demonstrate a genuine factual dispute, the

opposing party "must do more than simply show that there is some metaphysical doubt as to the

material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587

(citation omitted).

---

[4]  "The court need consider only the cited materials, but may consider other materials in the
record."  Fed. R. Civ. P. 56(c)(3).  Moreover, "[a] party may object that the material cited to support
or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ.
P. 56(c)(2).

1    IV.      UNDISPUTED AND DISPUTED FACTS

2              In accordance with Local Rule 260(a), defendants filed a Statement of Undisputed

3    Material Facts ("SUF") in support of their motion for summary judgment. (Defs.' SUF, Dkt.

4    No. 47, Doc. No. 47-2.)  Plaintiff failed to directly respond to defendants' Statement of

5    Undisputed Material Facts or file a statement of disputed facts, which violates Local Rule 260(b)

6    and the court's order requiring plaintiff to file an opposition and supporting materials that

7    comply with Federal Rule of Civil Procedure 56 and Local Rule 260.[5]  (Order, Apr. 16, 2012, at

8    2, Dkt. No. 57.)  Unless otherwise noted, the following facts have not been disputed by plaintiff.

9              On June 28, 2008, at approximately 8:40 p.m., uniformed officer Barreto of the

10   Benicia Police Department was traveling east in his department vehicle on Military East in

11   Benicia, California.  (Defs.' SUF ¶ 1; see also Barreto Decl. ¶ 3.)  Barreto was following a blue

12   Chevy van, which had an inoperable taillight in violation of California Vehicle Code § 24603(b).

13   (Defs.' SUF ¶ 2.)[6]  Barreto activated his vehicle's overhead lights and initiated a traffic stop, and

14   the van pulled into a parking stall located at 774 Military East in Benicia.[7]  (Id. ¶¶ 3-4.)

15   _____

16        [5]  In relevant part, Local Rule 260(b) provides:

17              Any party opposing a motion for summary judgment or summary
             adjudication shall reproduce the itemized facts in the Statement of
18           Undisputed Facts and admit those facts that are undisputed and deny those
             that are disputed, including with each denial a citation to the particular
19           portions of any pleading, affidavit, deposition, interrogatory answer,
             admission, or other document relied upon in support of that denial.  The
20           opposing party may also file a concise "Statement of Disputed Facts," and the
             source thereof in the record, of all additional material facts as to which there
21           is a genuine issue precluding summary judgment or adjudication.

22        [6]  At the hearing on defendants' motion for summary judgment, plaintiff argued that his
     taillight was not broken.  However, plaintiff produced no evidence or declaration substantiating his
23   claim that his taillight was operable on the night in question.

24        [7]  Plaintiff testified at deposition that the residence located at 772 Military East was owned
     by plaintiff's mother, and that plaintiff lived with his mother.  (Pl.'s Depo. at 10:9-18, 17:12-15.)
25   There is a potential discrepancy in the evidence in that Barreto declared that the van pulled into a
     parking stall at "774 Military East," and plaintiff declared that he lived at "772 Military East."  This
26   potential discrepancy is not material to the resolution of the pending motion.

1    When Barreto stopped and exited his vehicle, a man later identified as plaintiff

2   quickly exited the blue van and began to walk away from Barreto.  (Defs.' SUF ¶ 5.)  Barreto

3   ordered plaintiff to stop and sit back down in plaintiff's vehicle.  (Id. ¶ 6; Barreto Decl. ¶ 5.)

4   Instead of immediately complying with Barreto's command, plaintiff questioned Barreto

5   regarding why plaintiff needed to return to the vehicle.  (Defs.' SUF ¶ 7.)  Barreto then ordered

6   plaintiff to sit on the ground, but plaintiff again refused to comply and questioned the command.

7   (Id. ¶¶ 8-9.)  Plaintiff ultimately sat on the ground.  (Pl.'s Depo. at 41:3-5; Barreto Decl ¶ 5.)

8    Barreto informed plaintiff that he had pulled plaintiff over because of the van's

9   inoperable taillight, and asked for plaintiff's identification.  (Defs.' SUF ¶¶ 10-11.)  Plaintiff told

10   Barreto that he had no identification on his person, but that his identification was in the van.  (Id.

11   ¶ 11.)  Plaintiff was speaking quickly and appeared nervous to Barreto.  (Id. ¶ 12.)  Barreto

12   requested a "cover unit," and another uniformed Benicia Police Department officer, Simonson,

13   arrived a short time later.  (Id. ¶¶ 13-14.)

14    Barreto declares that because of plaintiff's "argumentative demeanor, his lack of

15   identification and his reluctance to follow [Barreto's] instructions, [Barreto] believed [plaintiff]

16   may be armed with a dangerous weapon."  (Barreto Decl. ¶ 7; see also Defs.' SUF ¶ 15.)  Barreto

17   declares that as a result of his suspicion, he "decided to conduct a pat frisk" and informed

18   plaintiff that he was going to search plaintiff "for identification and concealed weapons."

19   (Barreto Decl. ¶ 7; see also Defs.' SUF ¶¶ 15-16.)

20    Plaintiff contests Barreto's statement that Barreto intended to search plaintiff for

21   identification *and* concealed weapons.  (See Pl.'s Opp'n at 3-4.)  Plaintiff argues that Barreto

22   only intended to search plaintiff for identification, citing the Arrest Report and Incident Report

23   attached to the Second Amended Complaint for the proposition that "on 6/28/08 the defendants

24   neither speak [*sic*] of, not show [*sic*] any concern or fear of the plaintiff being dangerous or

25   ////

26   ////

having a weapon."[8]  (Pl.'s Opp'n at 3.)  Plaintiff contends that the evidence supports that Barreto

intended to search for identification, and was not motivated to conduct a pat-down search for

weapons based on a belief that plaintiff was armed and presently dangerous.  (Id.)  The Incident

Report completed by Barreto on June 29, 2008, states, in relevant part: "I advised Burns that I

was going to search him for any identification."  (Incident Report at 1, attached to Second Am.

Compl.)  Barreto's June 28, 2008 Arrest Report states that Barreto "attempted to search (S) for

ID and he attempted to flea [sic]."  (Arrest Report at 1, attached to Second Am. Compl.)  The

Supplemental Incident Report completed by Simonson states that upon Simonson's arrival on the

scene, he "heard officer Barreto tell Burns something to the affect [*sic*] of 'since you don't have

any identification, I'm going to pat you down for ID and Weapons . . . .'"  (Suppl. Incident

Report at 1, attached to Second Am. Compl.; accord Simonson Decl. ¶ 5.)

        In any event, Barreto told plaintiff to stand up and place his hands behind his

head, and then took control of plaintiff's wrists in order to conduct a pat-down frisk of plaintiff.

(Defs.' SUF ¶¶ 17-18.)  As Barreto began his frisk of the right side of plaintiff's body, plaintiff

immediately resisted the search both physically and verbally, straightening and locking out his

arms out and saying "no" to Barreto.  (Id. ¶¶ 19-20.)  Plaintiff attempted to break free and flee

from Barreto.  (Id. ¶ 21.)  Plaintiff ignored Barreto's commands that plaintiff relax his arms and

place his hands behind his head, and began to yell at Barreto.  (Id. ¶ 22; see also Barreto Decl.

¶ 10.)

        At this point, Simonson, fearing for Barreto's safety, un-holstered his Taser and

warned plaintiff multiple times that Simonson would use his Taser on plaintiff if plaintiff did not

_____

        [8]  Plaintiff also cites the parties' Joint Status Conference Report, in which defendants set
forth an unusually detailed statement of facts, but nowhere mentioned that Barreto intended to search
plaintiff for weapons.  (See Pl.'s Opp'n at 4 & Ex. B; Joint Status Conference Report at 4 ("Because
Mr. Burns stated that he had no identification on his person, Officer Barreto told Mr. Burns that he
was going to search Mr. Burns for identification."), Dkt. No. 40.)  Of course, the Joint Status Report
is not evidence and does not contain any affirmative admissions favoring plaintiff's version of
events.

1   cease resisting.  (Defs.' SUF ¶¶ 23-24.)  Barreto similarly warned plaintiff about Simonson's

2   potential and impending use of a Taser.  (Id. ¶ 25.)  During this struggle, plaintiff repeatedly

3   dropped to his knees and, at one point, Barreto managed to secure one of plaintiff's arms behind

4   plaintiff's back; but plaintiff's other arm remained in front of plaintiff and near plaintiff's

5   waistband.  (Defs.' SUF ¶¶ 26-27.)  Barreto remained unable to control plaintiff and did not

6   know if plaintiff possessed a dangerous weapon.  (Id. ¶ 28.)

7           Simonson believed that plaintiff posed a credible threat to Barreto and was

8   concerned that plaintiff might be armed with a dangerous weapon.  (Defs.' SUF ¶ 29.)

9   Accordingly, Simonson made direct contact with his Taser on plaintiff's left thigh, applying his

10  Taser in the "drive stun mode" for approximately one to two seconds.  (Id. ¶ 30; see also

11  Simonson Decl. ¶ 13.)  Plaintiff then leapt to his feet and pulled one arm away from Barreto's

12  control, which caused Barreto to disengage and move away from plaintiff to avoid an assault.

13  (Defs.' SUF ¶¶ 31-32.)

14          After Barreto moved away from plaintiff, Simonson deployed two Taser darts

15  onto plaintiff in the belief that plaintiff still posed a credible threat to Barreto.  (Defs.' SUF

16  ¶¶ 34-35.)  Plaintiff fell to the ground.  (Simonson Decl. ¶ 16; Barreto Decl. ¶ 17.)  After the

17  Taser's five-second cycle was complete, Barreto ordered plaintiff to place his hands behind his

18  back, and plaintiff complied.  (Barreto Decl. ¶ 17.)

19          Barreto searched plaintiff and found 3.3 grams of rock cocaine in plaintiff's front

20  right pocket.  (Defs.' SUF ¶ 36.)  Plaintiff was placed under arrest for possession of cocaine in

21  violation of California Health & Safety Code § 11350(a), and resisting a police officer in

22  violation of California Penal Code § 148(a)(1).  (Id. ¶ 37; see also Barreto Decl. ¶ 18; Arrest

23  Report at 1.)  Barreto transported plaintiff to the Benicia Police Department, where plaintiff was

24  examined by fire department personnel; plaintiff was subsequently transported to a hospital

25  where a physician removed the Taser darts and medically cleared plaintiff for transport to the

26  Solano County Jail.  (Defs.' SUF ¶¶ 38-39.)

1    It does not appear from the record that plaintiff was ever cited for a traffic

2    violation.  At the hearing, plaintiff represented that he was not cited for a traffic violation and

3    that all of the charges against him were ultimately dropped without a trial or any merits-based

4    hearing.  Defendants did not contest plaintiff's representations during the hearing.

5    V.    DISCUSSION

6            A.    Plaintiff's Claim of Unreasonable, Warrantless Searches

7    Defendants move for summary judgment in regards to the two searches that

8    plaintiff appears to challenge as being conducted in violation of plaintiff's Fourth Amendment

9    rights.  The first search consists of Barreto's initial pat-down search of plaintiff, which Barreto

10   declares was for the purpose of determining whether plaintiff had identification and was armed

11   and dangerous.  The second search consists of Barreto's search of plaintiff's pockets after

12   application of the Taser to plaintiff, wherein Barreto discovered rock cocaine on plaintiff's

13   person.  The undersigned addresses each search in turn, and addresses defendants' claim of

14   qualified immunity further below.

15           1.    Barreto's Initial Pat-Down Search of Plaintiff

16   Defendants move for summary judgment as to Barreto's initial pat-down search of

17   plaintiff on the grounds that there is no genuine dispute of material fact that Barreto was justified

18   in conducting a pat-down search of plaintiff's person pursuant to Terry v. Ohio, 392 U.S. 1, 27

19   (1968), and its progeny.[9]  Liberally construing plaintiff's opposition brief, plaintiff opposes

20   defendants' motion on the grounds that Barreto's pat-down of plaintiff was unconstitutional

21   because Barreto was not motivated to pat-down plaintiff on the basis of a reasonable suspicion

22   that plaintiff was armed and dangerous.  Plaintiff contends that, instead, Barreto was motivated

23

24   [9] Plaintiff did not challenge the constitutionality of Barreto's stop of plaintiff's vehicle on
the basis of plaintiff's non-functioning taillight in either the Second Amended Complaint or his
opposition to the motion for summary judgment.  Plaintiff attacked the basis for Barreto's search
25   of plaintiff's person.  To the extent that plaintiff attempted to challenge the traffic stop at the hearing,
such an argument is untimely.  Nevertheless, plaintiff failed to produce any evidence that creates a
26   genuine dispute of material fact as to the propriety of the traffic stop.

1   only by a desire to locate plaintiff's identification, which plaintiff had already stated was in the

2   van.

3          "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

4   Government, and its protections extend to brief investigatory stops of persons or vehicles that fall

5   short of traditional arrest." United States v. Willis, 431 F.3d 709, 714 (9th Cir. 2005) (quoting

6   United States v. Arvizu, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted). "To

7   justify a patdown of the driver or a passenger during a traffic stop . . . , just as in the case of a

8   pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion

9   that the person subjected to the frisk is armed and dangerous."[10] Arizona v. Johnson, 555 U.S.

10  323, 327 (2009); see also United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009) ("If an

11  officer reasonably suspects the individual may be armed and dangerous, the officer may 'frisk'

12  the person he has stopped to determine if the individual is carrying any weapons."). "Reasonable

13  suspicion is formed by specific, articulable facts which, together with objective and reasonable

14  inferences, form the basis for suspecting that the particular person detained is engaged in

15  criminal activity." United States v. Burkett, 612 F.3d 1103, 1107 (9th Cir. 2010) (citation and

16  quotation marks omitted). To determine whether reasonable suspicion existed to support a pat-

17  down search in the context of a lawful investigatory stop, the court considers the totality of the

18  circumstances surrounding the stop. Burkett, 612 F.3d at 1107; accord Johnson, 581 F.3d at 999.

19

20         [10]   The scope of the Terry pat-down or frisk exception to the probable cause requirement is
    "narrow." See Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979) ("Nothing in Terry can be understood
21  to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but
    weapons. The 'narrow scope' of the Terry exception does not permit a frisk for weapons on less than
22  reasonable belief or suspicion directed at the person to be frisked . . . ."). A pat-down or frisk
    conducted pursuant to Terry "is limited to a patdown of the exterior clothing." United States v.
23  Johnson, 581 F.3d 994, 999 (9th Cir. 2009). "Such a search . . . 'must be strictly limited to that
    which is necessary for the discovery of weapons which might be used to harm the officer or others
24  nearby.'" United States v. Hartz, 458 F.3d 1011, 1018 (9th Cir. 2006) (quotation marks omitted)
    (quoting Minnesota v. Dickerson, 508 U.S. 366, 373 (1993)). "If the protective search goes beyond
25  what is necessary to determine if the suspect is armed, it is no longer valid under Terry." Dickerson,
    508 U.S. at 373. Plaintiff does not argue that to assuming a pat-down search was permissible, the
26  scope of Barreto's pat-down exceeded the limits imposed by the Fourth Amendment.

1      In arguing that the pat-down search was unconstitutional, plaintiff relies heavily

2   on the Arrest Report and the Incident Reports, which suggest that Barreto's search was motivated

3   by a desire to locate plaintiff's identification and make no mention of Barreto's belief that

4   plaintiff was armed and dangerous.[11]   (Arrest Report at 1; Incident Report at 1; Suppl. Incident

5   Report at 1.)   At the outset, Terry does not permit a pat-down search merely to obtain a person's

6   identification.  See Ybarra, 444 U.S. at 93-94 ("Nothing in Terry can be understood to allow a

7   generalized 'cursory search for weapons' or indeed, any search whatever for anything but

8   weapons."); see also United States v. Hernandez-Mendez, 626 F.3d 203, 212 (4th Cir. 2010)

9   (stating that Terry does not permit the search of a person's purse simply to locate photographic

10  identification, but that the reasonableness of a Terry frisk is not judged on the basis of the

11  officer's subjective intent); People v. Garcia, 145 Cal. App. 4th 782, 787-88, 52 Cal. Rptr. 3d 70,

12  73-74 (Ct. App. 2006) (holding that Terry plainly does not authorize the pat-down of a person

13  simply to locate identification).   In contrast to, and really in supplementation of, the Arrest

14  Report and Incident Reports, Barreto's sworn declaration represents that Barreto patted down

15  plaintiff to find plaintiff's identification *and* because Barreto believed that plaintiff was armed

16  and dangerous.   (Barreto Decl. ¶ 7.)   Plaintiff does not challenge Barreto's declaration on

17  evidentiary grounds and has not presented evidence affirmatively contradicting Barreto's

18  declaration.

19      Were the constitutional standard against which a Terry frisk is to be judged a

20  subjective standard that only accounts for a law enforcement officer's subjective motivations,

21  plaintiff might come close to creating a genuine dispute of material fact as to the legitimate basis

22  for Barreto's pat-down search.   Even so, defendants correctly argue that Barreto declares under

23  penalty of perjury that he was motivated to search plaintiff for identification *and* weapons,

24

25      [11]   It is unclear, but ultimately immaterial, why Barreto searched plaintiff's person for
    identification when plaintiff had already advised Barreto that although he had no identification on
26  his person, his identification was in the van.

believing that plaintiff might be armed and dangerous.  Moreovaer, Barreto's unchallenged

declaration is not actually inconsistent with the Arrest Report or the Incident Reports.  However,

this entire dispute is largely misplaced because Barreto's pat-down search of plaintiff must be

evaluated, at least for the purpose of the Fourth Amendment, under an objective standard where

an officer's subjective motivations do not trump an otherwise legitimate search justified under

the *objective* circumstances.  See, e.g., Whren v. United States, 517 U.S. 806, 813 (1996)

(holding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment

analysis"); Ornelas v. United States, 517 U.S. 690, 696 (1996) ("The principal components of a

determination of reasonable suspicion or probable cause will be the events which occurred

leading up to the stop or search, and then the decision whether these historical facts, viewed from

the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to

probable cause."); cf. Devenpeck v. Alford, 543 U.S. 146, 155 (2004) (noting propriety of

objective standard when adjudging probable cause to arrest under the Fourth Amendment).

Accordingly, plaintiff's singular focus on Barreto's apparent or implied subjective motivations is

not controlling.

      Turning to the objective facts surrounding Barreto's pat-down of plaintiff,

defendants argue that the following facts substantiate Barreto's reasonable suspicion that plaintiff

was armed and dangerous:

> (1) After pulling into the parking stall, plaintiff immediately exited his car and attempted to leave the scene of the traffic stop;
>
> (2) Plaintiff initially refused to comply with Barreto's order to return to the area of the traffic stop;
>
> (3) Plaintiff initially refused to comply with Barreto's order to sit on the ground;
>
> (4) Plaintiff aggressively questioned the basis for Barreto's commands to return to the area of the traffic stop and to sit on the ground;
>
> (5) Plaintiff was speaking quickly and acting nervously; and
>
> (6) Plaintiff failed to produce identification.

13

1  (See Memo. of P. & A. In Supp. of Mot. for Summ. J. at 7-8; see also id. at 3 ("Because of

2  BURNS' argumentative demeanor, his lack of identification and his reluctance to follow

3  instructions, BARRETO believed BURNS may be armed with a dangerous weapon.").)

4  Defendants also note that these circumstances caused Barreto to call for a police cover unit.  (Id.

5  at 8.)  Again, plaintiff opposes these facts only by citing to the Arrest Report, Incident Reports,

6  and a status conference report, none of which actually contradicts the objective facts listed above.

7          The undersigned concludes that no genuine dispute of material fact exists in

8  regards to whether Barreto had a reasonable suspicion that plaintiff was armed and dangerous at

9  the time of the pat-down search.  In consideration of the totality of the circumstances surrounding

10  the traffic stop, the objective facts relied on by defendants substantiate as a matter of law that

11  Barreto patted down plaintiff on the basis of a reasonable belief that plaintiff was armed and

12  dangerous.  The material facts are that plaintiff immediately exited his vehicle and walked away

13  from the scene after being pulled over by Barreto, aggressively refused to comply with multiple

14  commands given by Barreto, was speaking quickly, and was acting nervously.  These objective

15  facts support Barreto's reasonable belief that plaintiff was armed and dangerous.  Less

16  convincing is defendants' reliance on plaintiff's failure to produce identification, especially

17  because it is undisputed that plaintiff told Barreto prior to the pat-down search that plaintiff's

18  identification was in the van.  Nevertheless, considering all of the objective facts incident to the

19  traffic stop and search, and plaintiff's failure to dispute those facts with evidence, the

20  undersigned concludes that defendants are entitled to summary judgment insofar as plaintiff

21  claims that Barreto's initial Terry search violated the Fourth Amendment.

22          2.      Barreto's Search of Plaintiff's Pockets That Produced Drugs

23          The second search at issue is Barreto's search of plaintiff's person after Simonson

24  applied his Taser to plaintiff and after Barreto ultimately secured control over plaintiff.

25  Defendants move for summary judgment on the ground that there is no genuine dispute of

26  material fact that this second search, which produced rock cocaine, was a lawful search incident

14

1   to arrest.  Plaintiff failed to address this argument in his opposition.  Assuming that the district

2   judge agrees with the above-stated recommendation that Barreto's Terry frisk of plaintiff was

3   constitutional, defendants are also entitled to summary judgment as to the second search of

4   plaintiff because the undisputed facts demonstrate that Barreto's second search was a valid

5   search incident to arrest.

6           The United States Supreme Court has held that "a police officer who makes a

7   lawful arrest may conduct a warrantless search of the arrestee's person and the area 'within his

8   immediate control.'"  Davis v. United States, 131 S. Ct. 2419, 2424 (2011) (citing Chimel v.

9   California, 395 U.S. 752, 763 (1969)).  Such a warrantless search "is conducted for the twin

10  purposes of finding weapons the arrestee might use, or evidence the arrestee might conceal or

11  destroy."  United States v. Maddox, 614 F.3d 1046, 1048 (9th Cir. 2010) (citing Chimel, 395

12  U.S. at 762-63); accord Arizona v. Gant, 556 U.S. 332, 339 (2009).  A search incident to arrest

13  must occur "roughly contemporaneous with the arrest."  United States v. Smith, 389 F.3d 944,

14  951 (9th Cir. 2004) (per curiam).

15          Here, Barreto searched plaintiff's pockets and found the subject drugs after

16  plaintiff actively and continuously resisted arrest by struggling to break free of Barreto, and after

17  Simonson discharged his Taser on plaintiff in order to subdue plaintiff.  It is readily apparent that

18  while the officers were regaining control over plaintiff, but prior to the search of plaintiff's

19  pockets, the officers had probable cause to arrest plaintiff for resisting a police officer.[12]  Plaintiff

20  does not contend that the officers lacked probable cause to arrest him for resisting a police officer

21  prior to the second search.  Accordingly, Barreto's search of plaintiff was a lawful search

22  incident to arrest.

23  ////

24

25          [12]  In relevant part, California Penal Code § 148(a)(1) makes it illegal to willfully resist,
    delay, or obstruct a public officer or peace officer in the discharge of his or her office or
26  employment.

15

1    Although not addressed by the parties, it makes no material difference under the

2 undisputed facts of this case that Barreto appears to have searched plaintiff *prior* to formally

3 arresting plaintiff.  In <u>Rawlings v. Kentucky</u>, 448 U.S. 98 (1980), the United States Supreme

4 Court held that where police officers have probable cause to arrest a suspect, but the formal arrest

5 occurs quickly *after* the search at issue, the search immediately preceding the arrest is

6 nonetheless a valid search incident to arrest.  <u>Id.</u> at 111 ("Where the formal arrest followed

7 quickly on the heels of the challenged search of petitioner's person, we do not believe it

8 particularly important that the search preceded the arrest rather than vice versa."); <u>accord</u> <u>Smith</u>,

9 389 F.3d at 951; <u>United States v. Potter</u>, 895 F.2d 1231, 1234 (9th Cir. 1990); <u>United States v.</u>

10 <u>Morgan</u>, 799 F.2d 467, 469 (9th Cir. 1986).  However, where the search precedes the formal

11 arrest, "items discovered during the search cannot support a determination of probable cause."

12 <u>Potter</u>, 895 F.2d at 1234; <u>see also</u> <u>Morgan</u>, 799 F.2d at 469 ("[A]n arrest that follows a search

13 must be supported by probable cause independent of the fruits of the search.").

14    Here, Barreto's search of plaintiff appears to have occurred shortly before Barreto

15 formally arrested plaintiff for resisting a police officer and drug possession.  However, Barreto

16 had independent probable cause to arrest plaintiff for resisting a police officer prior to the search

17 and based on plaintiff's conduct to that point.  <u>See</u>, <u>e.g.</u>, <u>Smith</u>, 389 F.3d at 951 ("So long as an

18 arrest that follows a search is supported by probable cause independent of the fruits of the search,

19 the precise timing of the search is not critical.").  Accordingly, the fact that the search might have

20 occurred prior to the formal arrest is of no material difference here, and the undersigned

21 recommends that defendants' motion for summary judgment be granted in regards to any

22 challenge by plaintiffs to the second search.

23   B.  <u>Plaintiff's Claim of Excessive Force</u>

24    Defendants also move for summary judgment as to plaintiff's claim that

25 Simonson violated plaintiff's Fourth Amendment rights to be free of unreasonable seizures by

26 deploying a Taser on plaintiff in the "drive stun mode" and in the "dart mode."  Plaintiff does not

1   address defendants' arguments at all in his opposition.  In short, the undersigned concludes that

2   defendants are entitled to summary judgment as to plaintiff's excessive force claim on the ground

3   that no constitutional violation occurred.  As addressed further below, Simonson is also entitled

4   to qualified immunity given the uncertainty of the law in June 2008 regarding the circumstances

5   under which the use of a Taser constitutes excessive force.

6            "Allegations of excessive force are examined under the Fourth Amendment's

7   prohibition on unreasonable seizures."  Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010)

8   (citing, among other authorities, Graham v. Connor, 490 U.S. 386, 394 (1989)).  All claims that

9   law enforcement officers used excessive force in the course of an arrest, investigatory stop, or

10  other seizure are analyzed exclusively under the Fourth Amendment's "reasonableness" standard.

11  See, e.g., Smith v. City of Hemet, 394 F. 3d 689, 700 (9th Cir. 2005) (en banc).  "Determining

12  the reasonableness of an officer's actions is a highly fact-intensive task for which there are no per

13  se rules."  Torres v. City of Madera, 648 F.3d 1119, 1124 (9th Cir. 2011); accord Mattos v.

14  Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) ("More recently, the Court has emphasized

15  that there are no per se rules in the Fourth Amendment excessive force context; rather, courts

16  'must still slosh [their] way through the factbound morass of 'reasonableness.'"  (modification in

17  original) (citing Scott v. Harris, 550 U.S. 372, 383 (2007)).

18           The reasonableness "analysis requires balancing the 'nature and quality of the

19  intrusion' on a person's liberty with the 'countervailing governmental interests at stake' to

20  determine whether the use of force was objectively reasonable under the circumstances."  Smith,

21  394 F.3d at 701 (citing Graham, 490 U.S. at 396).  The court first considers the "nature and

22  quality of the alleged intrusion."  Mattos, 661 F.3d at 441.  The court then considers the

23  governmental interests at stake by examining three non-exclusive factors: "(1) how severe the

24  crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or

25  others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by

26  flight."  Id.  The second of these factors—whether the suspect posed an immediate threat to the

1    safety of the officers or others—is the "most important" factor.  Id.

2              In terms of the nature and quality of the alleged intrusion at issue, the Ninth

3    Circuit Court of Appeals has separately characterized the use of a Taser in the "drive stun mode"

4    and the "dart mode."  In terms of use of a Taser in the "dart mode," the Court of Appeals has

5    held that such usage constitutes "an intermediate, significant level of force that must be justified

6    by the governmental interest involved."[13]  Bryan, 630 F.3d at 826.  The Court of Appeals has not

7    specifically categorized the nature and quality of the intrusion at issue when a Taser is used in the

8    "drive stun" mode, which is apparently a lower setting or lesser application of the Taser than the

9    "dart mode."[14]  See Mattos, 661 F.3d at 443.  Even assuming that use of the Taser in either mode

10   constitutes an intermediate, significant level of force, the undersigned concludes that under the

11   circumstances of this case, there is no genuine dispute of material fact that Simonson's use of his

12   Taser was reasonable under the circumstances and did not constitute excessive force in light of

13   the governmental interests at stake.

14   _____

15       [13] Although the record in this case does not reveal what model of Taser Simonson used (see
     Simonson Decl. ¶¶ 9-11, 13-14, 16-17), in Bryan, the Ninth Circuit Court of Appeals described the
16   Taser X26's "dart mode" as follows:

17                The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum
                  darts tipped with stainless steel barbs connected to the X26 by insulated
18                wires—toward the target at a rate of over 160 feet per second. Upon striking
                  a person, the X26 delivers a 1200 volt, low ampere electrical charge through
19                the wires and probes and into his muscles.  The impact is as powerful as it is
                  swift.  The electrical impulse instantly overrides the victim's central nervous
20                system, paralyzing the muscles throughout the body, rendering the target limp
                  and helpless.  The tasered person also experiences an excruciating pain that
21                radiates throughout the body.

22   Bryan, 630 F.3d at 824 (footnotes and citations omitted).

23       [14] In Mattos, the Court of Appeals generally described the use of a Taser in "drive stun
     mode" as follows: "When a taser is used in drivestun mode, the operator removes the dart cartridge
24   and pushes two electrode contacts located on the front of the taser directly against the victim.  In this
     mode, the taser delivers an electric shock to the victim, but it does not cause an override of the
25   victim's central nervous system as it does in dart-mode."  Mattos, 661 F.3d at 443.  But the Court
     of Appeals ultimately stated that the record in Mattos was insufficient to "to determine what level
26   of force is used when a taser is deployed in drive-stun mode."  Id.

1    In terms of the first traditional factor addressed to the government's interests, it

2    cannot be disputed that the severity of plaintiff's *initial* alleged crime—a broken taillight—was

3    minuscule.  See Bryan, 630 F.3d at 828 ("It is undisputed that Bryan's initial 'crime' was a mere

4    traffic infraction—failing to wear a seatbelt—punishable by a fine.  Traffic violations generally

5    will not support the use of a significant level of force.").  However, just before Simonson applied

6    his Taser to plaintiff's body, plaintiff was undisputedly resisting a police officer in a very

7    physical manner, which constituted a violation of the California Penal Code that inherently

8    placed Barreto in harm's way.

9    In regards to the second factor, the undisputed facts establish that plaintiff posed

10   some threat to Barreto.  Plaintiff was actively resisting Barreto's attempt to control and

11   prophylactically search plaintiff.  It is undisputed that just prior to the use of the Taser in the

12   "drive stun mode," plaintiff had repeatedly and evasively dropped to his knees, and one of

13   plaintiff's hands was free and near his waistband.  Neither officer could determine during the

14   struggle whether plaintiff was actually armed.  Additionally, it is undisputed that plaintiff reacted

15   violently to the first application of the Taser, leaping to his feet and breaking one arm free from

16   Barreto.  Only then did Simonson deploy the Taser in "dart mode."  Under these circumstances,

17   plaintiff posed a threat to Barreto, and plaintiff does not contend otherwise.  Thus, this "most

18   important" factor tips against a finding of excessive force.

19   Third, plaintiff was "actively" resisting Barreto and Simonson prior to

20   Simonson's use of the Taser, rather than passively resisting.  See Bryan, 630 F.3d at 830

21   ("Following the Supreme Court's instruction in Graham, we have drawn a distinction between

22   passive and active resistance.").  Plaintiff initially walked away from the scene of the traffic stop

23   and refused, at first, to return to the scene or comply with Barreto's commands.  More seriously,

24   plaintiff repeatedly broke out of Barreto's restraint and repeatedly dropped to his knees in an

25   apparent attempt to flee of fight.  Plaintiff does not refute any of defendants' characterizations of

26   his resistance during the incident.

1        Aside from the three factors addressed above, it is important to note that Barreto

2   and Simonson repeatedly warned plaintiff of the potential and imminent use of the Taser if

3   plaintiff did not comply with their commands and cease resisting.  See Bryan, 630 F.3d at 831

4   (finding that lack of a warning about imminent use of a Taser where feasible militates in favor of

5   finding excessive force).  It is undisputed that Simonson warned plaintiff multiple times prior to

6   using the Taser in the "drive stun mode" that he would deploy the Taser against plaintiff if

7   plaintiff continued resisting Barreto.  It is also undisputed that Barreto similarly warned plaintiff

8   prior to the first application of the Taser.  These warnings favor finding that the use of the Taser

9   was reasonable and not constitutionally excessive.

10       Balancing the nature and quality of the alleged intrusions and the governmental

11  interests at stake, the undersigned concludes that there is no genuine dispute of material fact that

12  under the totality of the circumstances, Simonson's use of the Taser on plaintiff was reasonable.

13  This conclusion is bolstered by the fact that plaintiff offered no argument or evidence in

14  opposition suggesting that Simonson's use of the Taser was unreasonable.  Accordingly, the

15  undersigned recommends that defendants' motion for summary judgment be granted insofar as

16  Simonson's use of the Taser is concerned on the grounds that no constitutional violation

17  occurred.

18       C.    Qualified Immunity

19       Finally, defendants move for summary judgment on the ground that they are also

20  entitled to qualified immunity for all of the Fourth Amendment violations alleged by plaintiff.

21  Defendants' argument is well-taken, and plaintiff failed to address the question of qualified

22  immunity at all.

23       "The doctrine of qualified immunity protects government officials 'from liability

24  for civil damages insofar as their conduct does not violate clearly established statutory or

25  ////

26  ////

20

constitutional rights of which a reasonable person would have known.'"[15]  Pearson v. Callahan,

555 U.S. 223, 231 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Prior to the

Supreme Court's decision in Pearson v. Callahan, "courts considering an official claim of

qualified immunity followed the two-step protocol established in Saucier v. Katz, 533 U.S. 194

. . . (2001), which required [courts] first to determine whether the defendant violated a

constitutional right and then to determine whether that right was clearly established." See James

v. Rowlands, 606 F.3d 646, 650-51 (9th Cir. 2010) (citing Pearson, 129 S. Ct. at 818).  In

Pearson, however, "the Supreme Court reversed this earlier rule and gave courts discretion to

grant qualified immunity on the basis of the 'clearly established' prong alone, without deciding

in the first instance whether any right had been violated."  Id. at 651 (citing Pearson, 129 S. Ct.

at 818); see also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (stating that "lower courts

have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first").

A government official's conduct "violates clearly established law when, at the

time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

'reasonable official would have understood that what he is doing violates that right.'"  al-Kidd,

131 S. Ct. at 2083 (modification in original) (citing Anderson v. Creighton, 483 U.S. 635, 640

(1987)).  "The plaintiff bears the burden to show that the contours of the right were clearly

established."  Clairmont v. Sound Mental Health, 632 F.3d 1091, 1109 (9th Cir. 2011).  "[T]he

right allegedly violated must be defined at the appropriate level of specificity before a court can

determine if it was clearly established."  Wilson v. Layne, 526 U.S. 603, 615 (1999).  Although

the Supreme Court does "not require a case directly on point" to define the right at issue and the

violation of that right, "existing precedent must have placed the statutory or constitutional

question beyond debate."  al-Kidd, 131 S. Ct. at 2083; see also Reichle v. Howards, 132 S. Ct.

---

[15]  In assessing a claim of qualified immunity at the summary judgment stage, and "[w]here disputed issues of material fact exist, [the court] assume[s] the version of the material facts asserted by the non-moving party."  Mattos, 661 F.3d at 439.  However, plaintiff failed to set forth any "version of the material facts" in opposing the motion for summary judgment.

2088, 2093 (2012).  "Whether the law was clearly established is an objective standard; the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant."  Clairmont, 632 F.3d at 1109.

Here, the undersigned concludes that Barreto is entitled to qualified immunity in regard to his two searches of plaintiff.  As stated above, neither Barreto's initial pat-down search of plaintiff nor his search of plaintiff incident to arrest violated plaintiff's Fourth Amendment rights.  Accordingly, Barreto is entitled to qualified immunity because of the absence of a constitutional violation.  The undersigned does not reach the question whether plaintiff's rights vis-a-vis the searches was clearly established.[16]

In regards to Simonson's use of a Taser on plaintiff in both the "drive stun mode" and "dart mode," the undersigned concludes that Simonson is entitled to qualified immunity.  As an initial matter, and as stated above, Simonson's use of the Taser effectuated no constitutional violation.

Additionally, Simonson is entitled to qualified immunity in regards to his use of the Taser because the law regarding the use of a Taser under the facts roughly presented here was not clearly established on June 28, 2008.  It bears repeating that plaintiff failed to address the issue of qualified immunity at all and, therefore, failed to meet his burden to show that the law regarding the use of Tasers was clearly established on June 28, 2008.  Accordingly, the qualified immunity analysis could end here.

In any event, a reasonable law enforcement officer would not have known, as of June 28, 2008, that the progressive use of a Taser in the "drive stun mode" and then the "dart mode" to induce compliance from a confrontational suspect who actively and aggressively resisted another officer's commands and attempts to restrain and search that suspect, who readily

---

[16]  Given the well-settled principles attendant to Terry pat-down searches and searches incident to arrest of the sort that occurred here, defendants would be hard-pressed to demonstrate an absence of clearly established law in June 2008.

appeared to pose an immediate threat to the other office, and who was not under either officer's

control constituted excessive force in violation of the Fourth Amendment.  The undersigned has

not found a case holding that the progressive use of a Taser under the circumstances present here

constituted a constitutional violation at all, let alone a case demonstrating that the constitutional

question was "beyond debate" on or around June 28, 2008.  Only upon the Ninth Circuit Court of

Appeals' publication of opinions in Bryan v. MacPherson in 2010, and Mattos v. Agarano in

2011, did the law regarding the use of Tasers—and the distinctions between use in the drive stun

and dart modes—began to gain some clarity, albeit in factual scenarios distinguishable from the

facts here.  Additionally, courts have concluded that the law regarding Taser usage was not

clearly established in or around the date of the incident underlying this case.  See, e.g., Sanchez

v. Kimmins, No. 10-15985, 2012 WL 562596, at *1 (9th Cir. Feb. 22, 2012) (unpublished)

(holding that as of May 14, 2006, "a reasonable officer would not have known that using a taser

[three times] to induce compliance from an individual who appeared to pose an immediate threat

and who was not under the officer's control violated the Fourth Amendment's prohibition on

excessive force"); Wade v. Fresno Police Dep't, No. 1:09-CV-0599 AWI-BAM, 2102 WL

253252, at *15-17 (E.D. Cal. Jan. 25, 2012) (unpublished) (concluding that as of April 25, 2008,

a reasonable officer would not have had fair warning that using low level hands-on force and a

Taser in drive stun mode on a resisting, handcuffed arrestee was unconstitutional); Dang v. City

of Garden Grove, No. SACV 10-00338 DOC (MLGx), 2011 WL 3419609, at *8-9 (C.D. Cal.

Aug. 2, 2011) (unpublished) ("Prior to September 3, 2008, no Supreme Court or Ninth Circuit

decision had discussed the constitutionality of Tasers."); Carter v. City of Carlsbad, 799 F. Supp.

2d 1147, 1158-59 & n.6 (S.D. Cal. 2011) (concluding that as of October 31, 2009, a reasonable

officer would not have known that using a Taser in the dart mode to subdue a suspect after one

verbal warning to "stop" violated the Fourth Amendment).  In light of these authorities, the

undersigned cannot conclude that the state of the law on June 28, 2008, placed the relevant

"constitutional question beyond debate."  See al-Kidd, 131 S. Ct. at 2083.  Accordingly,

1   Simonson is entitled to qualified immunity.

2   VI.   <u>CONCLUSION</u>

3            For the foregoing reasons, IT IS HEREBY ORDERED that plaintiff's motion for

4   relief from a final judgment, final order, or final proceeding pursuant to Federal Rule of Civil

5   Procedure 60(b)(3), which is contained in plaintiff's opposition to defendants' motion for

6   summary judgment (Dkt. No. 58), is denied.

7            It is FURTHER RECOMMENDED that:

8            1.       Defendants' motion for summary judgment (Dkt. No. 47) be granted;

9            2.       Judgment be entered in favor of defendants; and

10           3.       The Clerk of Court be directed to close this case and vacate all dates.

11           These findings and recommendations are submitted to the United States District

12   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen

13   days after being served with these findings and recommendations, any party may file written

14   objections with the court and serve a copy on all parties.  <u>Id.</u>; <u>see also</u> E. Dist. Local Rule 304(b).

15   Such a document should be captioned "Objections to Magistrate Judge's Findings and

16   Recommendations."  Any response to the objections shall be filed with the court and served on

17   all parties within fourteen days after service of the objections.  E. Dist. Local Rule 304(d).

18   Failure to file objections within the specified time may waive the right to appeal the District

19   Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d

20   1153, 1156-57 (9th Cir. 1991).

21           IT IS SO ORDERED AND RECOMMENDED.

22   DATED:  June 14, 2012

23

24   KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

25

26